# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 25-mj-8240-WM

**IN RE SEALED COMPLAINT**

_____/

FILED BY_____SW_____D.C.

May 8, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

### <u>CRIMINAL COVER SHEET</u>

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?  No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?  No

Respectfully submitted,

LORINDA LARYEA, ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By: _____  for
_____
SARA E. PORTER
SHANKAR RAMAMURTHY
TRIAL ATTORNEYS
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20530
Tel: (202) 257-6778
sara.porter@usdoj.gov
shankar.ramamurthy@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   25-8240-mj-WM |
| ARTEM KASHPUR, | ) | |
| | ) | |
| _____ | ) | |
| *Defendant.* | | |

**FILED BY** _____ **SW** _____ **D.C.**

*May 8, 2025*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____May 2022 to September 2022_____ in the county of _Palm Beach_____ in the _____Southern_____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

**Nicholas Tarquin**
Digitally signed by Nicholas Tarquin
Date: 2025.05.08 11:03:15 -05'00'

*Complainant's signature*

Nicholas Tarquin, Special Agent, HHS-OIG
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by _____

Date:   _05/08/2025_____

*Judge's signature*

City and state:   _____West Palm Beach, Florida_____

Honorable William Matthewman, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Nicholas Tarquin, a Special Agent of the U.S. Department of Health & Human Services, Office of Inspector General, being duly sworn, do hereby state the following is true and correct to the best of my knowledge and belief:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("HHS-OIG"), Office of Investigations ("OI"), and have been so employed since February 2023. In my capacity as a Special Agent, I have participated in numerous investigations of criminal activity involving, among other things, health care fraud, wire fraud, and mail fraud. During the course of these investigations, I have conducted or participated in surveillance, the execution of arrest and search warrants, debriefings of informants and other witnesses, analysis of financial and telephone records, and I have reviewed claims data, medical records, and other business records. As a result of my training and experience, I am familiar with techniques and methods of operation used by individuals involved in criminal activity to facilitate various kinds of fraud and to conceal their activities from detection by law enforcement authorities. In addition to my work experience, I have received specialized training in the field of health care fraud from the HHS-OIG-OI and other entities.

2.      This affidavit is submitted in support of a criminal complaint and arrest warrant. For the reasons set forth below, I respectfully submit that this affidavit contains probable cause to believe that **ARTEM KASHPUR** ("**KASHPUR**") has violated Title 18, United States Code, Section 1349 (Conspiracy to Commit Wire Fraud). I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information

communicated or reported to me during the investigation by other participants in the investigation. This affidavit is intended to show only that there is probable cause to support the complaint for the requested arrest warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

### A.   **Overview of Investigation**

3.      This investigation began in late 2022, when the Federal Bureau of Investigation ("FBI") and HHS-OIG identified a nationwide scheme to defraud numerous health care benefit programs, including Medicare and Medigap Supplemental Insurers, by submitting claims for durable medical equipment ("DME"), specifically continuous glucose monitors and urinary catheters, which were neither medically necessary nor provided as represented. The investigation revealed that several associated individuals, both domestic and abroad (the "Organization"), purchased DME companies that were already enrolled with Medicare and other health care benefit programs, changed the ownership information with the respective secretaries of state utilizing the names of nominee owners, but failed to submit enrollment applications reflecting the change in ownership with the health care benefit programs.

4.      The Organization further directed nominee owners to open bank accounts in the names of the DME companies for the purpose of receiving the proceeds of the fraud scheme. Following the sales, the DME companies submitted tens to hundreds of millions of dollars in claims to Medicare and other health care benefit programs for DME, primarily continuous glucose monitors and urinary catheters, that were neither medically necessary nor dispensed as represented. Tens to hundreds of millions of dollars have been reimbursed by these health care benefit programs and received into these accounts, and subsequently transferred to other accounts, including

accounts overseas. Investigators have identified at least thirty DME companies across the country that participated in this scheme, including WEST LAKE RX LLC ("WEST LAKE") and 360 DME SUPPLIER LLC ("360 DME").

**B.     The Medicare Program**

5.      The Medicare program ("Medicare") is a federally funded health insurance program providing health benefits to individuals who are 65 years of age or older or disabled. Medicare is administered by HHS, through its agency, the Centers for Medicare and Medicaid Services ("CMS").

6.      Medicare is a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

7.      Individuals who qualify for Medicare benefits are commonly referred to as "beneficiaries." Each beneficiary is given a unique Medicare identification number.

8.      Medicare covers different types of benefits, which are separated into different program "parts:" Medicare Parts A through D. Medicare Part B covers medically necessary physician services and outpatient care, including DME, such as prosthetics, orthotics, continuous glucose monitors, urinary catheters, and braces.

9.      DME companies, physicians, and other health care providers (collectively, "providers") that provide items or services to beneficiaries are able to apply for and obtain a National Provider Identifier ("NPI"). To participate in Medicare, providers are required to submit an enrollment application. As provided in the application, every provider is required to meet certain standards to obtain and retain billing privileges to Medicare, including: (1) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (2) disclose persons and/or organizations with ownership

interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions; (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity. Providers are provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

10.     Upon a change in ownership to an enrolled Medicare provider, the provider is required to re-submit an enrollment application setting forth details of the new ownership, including the names of all owners and managing employees, contact information, and a certification by any new individuals that they will abide by Medicare rules and regulations. The enrollment application must be approved by Medicare before the provider can be reimbursed for claims following a change in ownership.

11.     If Medicare approves the application, Medicare assigns the provider a Medicare Provider Identification Number ("PIN" or "provider number"). Providers assigned a Medicare PIN to render services to beneficiaries can submit claims for reimbursement to Medicare that include the PIN assigned to that provider. Payments under Medicare are often made directly to the provider rather than to a Medicare beneficiary. This payment occurs when providers submit the claim to Medicare for payment, either directly or through a billing company. CMS contracts with various companies to receive, adjudicate, process, and pay Medicare Part B claims, including claims for DME.

12.     Under Medicare Part B, DME is required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered by a medical professional,

properly documented, and provided as represented to Medicare.

13.     Medicare uses the term "ordering/referring" provider to identify the physician or nurse practitioner who orders, refers, or certifies an item or service reported in that claim. Individuals who order, refer, or certify these items or services are required to have the appropriate training, qualifications, and licenses.

14.     A Medicare claim is required to set forth, among other things, the beneficiary's name, the date the items or services are provided, the cost of the items or services, the name and identification number of the physician or other health care provider who orders the items or services, and the name and identification number of the provider who provides the items or services. Providers convey this information to Medicare by submitting claims using billing codes and modifiers.

15.     Medicare regulations require providers to maintain complete and accurate patient medical records reflecting the medical assessments and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom items or services are provided and for whom claims for payment are submitted. Medicare requires complete and accurate patient records so that Medicare can verify that the items or services are provided as described on the claim form and to permit Medicare to review the appropriateness of payments made to providers.

16.     Medigap, also known as Medicare Supplemental Insurance, helps fill "gaps" of Medicare coverage and is sold by private health insurance companies. A Medigap plan can help pay some of the remaining health care costs not covered by Medicare, such as copayments, coinsurance, and deductibles. For DME claims, a Medigap plan generally covers approximately 20% of the claim amount. Medicare Supplemental Insurers are contractually obligated to

reimburse claims that are processed by Medicare, even if Medicare has subsequently suspended payment of the claims.

C.    **The Defendant and Relevant Entities**

17.    The defendant, **KASHPUR**, is a Ukrainian citizen who is a legal resident of the United States and resides in Broward County, Florida.  **KASHPUR** works as a semi-truck driver, and, as such, his location is transient. At certain times, **KASHPUR** controlled two DME companies involved in the fraudulent scheme, WEST LAKE and 360 DME.

18.    WEST LAKE, formed in or around May 2020, and located in Bexar County, Texas, purported to operate as a DME provider and was approved by Medicare to supply medically necessary DME to beneficiaries.

19.    360 DME, formed in or around September 2018, and located in Dallas County, Texas, purported to operate as a DME provider and was approved by Medicare to supply medically necessary DME to beneficiaries.

20.    Kashpur Management, Inc. ("Kashpur Management"), formed in or around August 2021, is a New York corporation operated by **KASHPUR**.

21.    Billing Company 1, formed in 2016, with its principal place of business in Fresno County, California, operates a medical claim entry business that contracts with providers to assist them in submitting claims to Medicare and other health care benefit programs.

22.    Billing Company 2, formed in 1996, with its principal place of business in Frederick County, Maryland, operates a medical claim entry business that contracts with providers to assist them in submitting claims to Medicare and other health care benefit programs.

**Relevant Financial Accounts**

23.    WEST LAKE held business account x8320 at Financial Institution 1 ("WEST

LAKE ACCOUNT"). As of May 31, 2022, **KASHPUR** controlled and was the sole signatory on the WEST LAKE ACCOUNT.

24.     360 DME held business account x8262 at Financial Institution 1 ("360 DME ACCOUNT"). As of July 11, 2022, **KASHPUR** controlled and was the sole signatory on the 360 DME ACCOUNT.

25.     Kashpur Management held business account x7259 at Financial Institution 1 ("Kashpur Management Account"). As of August 3, 2021, **KASHPUR** controlled and was the sole signatory on the Kashpur Management Account.

<u>**WEST LAKE**</u>

*a.  Sale to **KASHPUR***

26.     At the time of WEST LAKE's formation, Individual 3, Individual 4, and Individual 5 were listed as the owner/managers of the limited liability company with the Texas Secretary of State.

27.     On or about May 26, 2022, WEST LAKE was sold to Kashpur Management for a purchase price of $75,000.

28.     **KASHPUR** executed the Purchase Agreement as President of Kashpur Management.

29.     As part of the purchase agreement, **KASHPUR** leased the premises on which WEST LAKE was located, to continue to operate out of WEST LAKE's physical address in Bexar County, Texas.

30.     On or about May 31, 2022, **KASHPUR** signed a signature card for the WEST LAKE ACCOUNT, at a Palm Beach County branch of Financial Institution 1. **KASHPUR** provided his social security number and telephone number as proof of identification.

31.    When **KASHPUR** took ownership of WEST LAKE, a Medicare enrollment application was not submitted for a change of ownership, as required by Medicare.

b. *Beneficiary Complaints*

32.    Beginning on or about July 26, 2022, beneficiaries began making complaints about WEST LAKE to Medicare's complaint hotline, 1-800-MEDICARE, which fields telephone calls from the public regarding any Medicare-related issue, including fraud, waste, abuse, or quality of care issues, and to the HHS-OIG Office of Investigations. Between July 26, 2022, and February 9, 2024, Medicare received approximately 6,589 beneficiary complaints listing WEST LAKE as the subject of the complaint, and many of the beneficiaries reported that they received no items or services from WEST LAKE.

c. *Interviews with Former Owner, Broker, Leasing Agent, and Employee of WEST LAKE*

33.    On November 18, 2022, investigators interviewed the broker of the sale of WEST LAKE, who stated that Individual 5 reached out to the brokerage to sell WEST LAKE. The broker indicated that in May 2022, **KASHPUR** purchased WEST LAKE.

34.    On January 11, 2023, investigators interviewed Individual 1, one of the former owners of WEST LAKE, who stated that the owners decided to sell WEST LAKE because, due to the COVID-19 pandemic, business was not lucrative. The sale was completed through a broker, and **KASHPUR** was the buyer. As part of the sale, **KASHPUR** specifically inquired about WEST LAKE's Medicare enrollment. Individual 1 stated that he/she forgot to remove his/her cellular telephone number from the WEST LAKE ACCOUNT and started receiving voicemails from patients inquiring about being billed for continuous glucose monitors. Individual 1 reached out to **KASHPUR** about these voicemails but did not hear back. Individual 1 stated that **KASHPUR** did not change the ownership for WEST LAKE with Medicare so it appeared as though Individual 1

was still the owner.

35.    On January 13, 2023, investigators interviewed the assistant property manager of the property upon which WEST LAKE was situated. The property manager stated that while **KASHPUR** took over the lease of WEST LAKE from Individual 1, he/she never met **KASHPUR**. The property manager stated that after **KASHPUR** assumed the WEST LAKE lease, no one was ever seen operating the store front. The property manager stated that **KASHPUR** abandoned the property after a few months and owes the leasing company money for breaking the lease.

36.    On May 16, 2023, investigators interviewed an employee of WEST LAKE who started working there in the summer of 2022. The employee told investigators that his/her role was to collect the mail and deposit checks made out to WEST LAKE from government and commercial insurance companies into WEST LAKE's business bank account at Financial Institution 1. The employee sent photographs of deposit slips every time he/she made deposits to an unknown female on a "burner"[1] phone. The employee learned from reviewing the mail that WEST LAKE was billing insurers for continuous glucose monitors. The employee stated that WEST LAKE was an empty store front, and that no products or prescriptions were stored or shipped from there. The employee determined **KASHPUR** to be the owner of WEST LAKE based upon his/her review of the mail, but he/she never met **KASHPUR**. The employee traveled to WEST LAKE approximately five times over a period of six months to check the mail and deposit checks. At some point, the employee began to suspect that WEST LAKE was committing fraud and began shredding all checks.

---

[1] Based on my training and experience, a "burner" phone is typically a cheap, prepaid mobile phone that has no attachment to the owner's identity or personal information.  In my training and experience, burner phones are frequently used by individuals seeking anonymity.

*d. Medicare Billing Records*

37.     An analysis of WEST LAKE's Medicare billing records indicates that WEST LAKE billed for items from June 22, 2022, through February 9, 2024, for approximately 49 beneficiaries who had been deceased for 30 or more days. Medicare providers who repeatedly bill for items or services provided to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of their provision of bona fide medical services to beneficiaries. As such, repeated billing of items or services to dead beneficiaries is an indicator that the entity is engaged in fraudulent billing for items or services that are not medically necessary and/or not actually provided.

38.     Analysis of WEST LAKE's Medicare billing records for that same time period also indicates that approximately 97% of beneficiaries had no prior relationship with the referring provider. Again, Medicare providers who repeatedly bill for services rendered to beneficiaries who did not have an established relationship with the referring provider are often using Medicare beneficiary information that has been purchased or unlawfully transferred rather than collected in the ordinary course of their provision of bona fide medical services to beneficiaries. As such, repeated billing for items or services purportedly referred by providers who did not have an established relationship with beneficiaries is an indicator that the entity is engaged in fraudulent billing for items or services that are not medically necessary and/or not actually provided.

*e. Beneficiary and Provider Interviews*

39.     Investigators interviewed six beneficiaries who allegedly received continuous glucose monitors from WEST LAKE. All beneficiaries denied receiving continuous glucose monitors from WEST LAKE and had never seen the referring provider or heard of WEST LAKE.

40.     Investigators interviewed four providers who signed orders for continuous glucose monitors filled by WEST LAKE. The providers were all recruited by a telemedicine company through an advertisement on Indeed.com that sought physicians to review medical orders for diabetic patients to determine if they met the criteria for continuous glucose monitors. The physicians were told that the beneficiaries were established diabetic patients who had been vetted by a mid-level provider. The physicians received batches of orders via email to review and sign if the beneficiary met the criteria for a continuous glucose monitor. The physicians became aware that the orders were being filled by WEST LAKE when the beneficiaries began calling their offices to complain about the fraudulent billing. Two of the four providers self-reported themselves to the HHS-OIG hotline regarding the complaints.

f.   *Financial Records*

41.     A review of WEST LAKE's financial records revealed activity inconsistent with the running of a large-scale continuous glucose monitor business. For example, a detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a continuous glucose monitor business, such as a large volume of continuous glucose monitor purchases, shipping or packaging fees, and/or storage fees. Furthermore, most of the funds that flowed into the WEST LAKE ACCOUNT was then quickly withdrawn, with some funds being sent to foreign bank accounts, including to accounts in China.

g.   *Billings to Medicare*

42.     Beginning on or about May 26, 2022, and continuing through on or about September 26, 2022, WEST LAKE billed Medicare approximately $17,072,635 for continuous glucose monitors and continuous glucose monitor supplies, and Medicare paid WEST LAKE

11

approximately $8,172,824, with approximately $6,650,673.06 being direct deposited by Medicare Administrative Contractor ("MAC") CGS Administrators, LLC ("CGS") into the WEST LAKE ACCOUNT. For some claims, a Medigap Supplemental Insurer paid out additional funds to WEST LAKE for continuous glucose monitors and related supplies.

### 360 DME

a. *Sale to **KASHPUR***

43.     At the time of 360 DME's formation, Individual 2 and Individual 3 were listed as the owners/managers of the limited liability company with the Texas Secretary of State.

44.     On or about July 5, 2022, 360 DME was sold to Kashpur Management for a purchase price of $75,000.

45.     **KASHPUR** executed the Bill of Sale and Purchase Agreement as President of Kashpur Management.

46.     As part of the purchase agreement, **KASHPUR** signed a three-year lease agreement with Individual 2, the owner of the property on which 360 DME was located, to continue to operate out of 360 DME's physical address, in Dallas County, Texas.

47.     On or about July 11, 2022, **KASHPUR** signed a signature card for the 360 DME ACCOUNT, at a Palm Beach County branch of Financial Institution 1. **KASHPUR** provided his Florida driver's license as proof of identification.

48.     When **KASHPUR** took ownership of 360 DME, a Medicare enrollment application was not submitted for a change of ownership, as required by Medicare.

b. *Beneficiary Complaints*

49.     Beginning on or about August 3, 2022, beneficiaries began making complaints about 360 DME to Medicare's complaint hotline, and to the HHS-OIG Office of Investigations.

Between August 3, 2022, and February 9, 2024, Medicare received approximately 6,566 beneficiary complaints listing 360 DME as the subject of the complaint, and many of the beneficiaries reported that they received no items or services from 360 DME.

     *c. Site Inspection*

     50.    On September 23, 2022, investigators conducted surveillance of 360 DME and observed no foot traffic or business activity at the location. A photograph taken during that surveillance is depicted below:



     51.    On September 26, 2022, investigators again conducted surveillance of 360 DME and noticed that the doors were locked during normal business hours. Investigators looked through the glass windows and observed scooters, compression socks, and DME equipment. A sign was taped behind the glass door that stated, "Out for delivery" and provided a number to call for "immediate assistance," which was a number that belonged to the former owner of 360 DME. Investigators spoke with an individual who arrived outside the facility, who stated, "he/she sold 360 and he/she is running the U-Haul store."

     *d. Interviews with Former Owners, Broker, and Employee of 360 DME*

     52.    On November 16, 2022, investigators interviewed Individual 2, one of the former

owners of 360 DME, who stated that he/she formed 360 DME near the end of 2018. 360 DME had trouble securing insurance contracts, and business was very slow. Individual 2 estimated that 360 DME only billed Medicare and Medicaid a few thousand dollars while he/she and Individual 3 owned the business. In September 2020, Individual 2 was contacted by a broker proposing that he/she would sell 360 DME, and Individual 2 accepted the proposal. In mid-2022, the broker reported that he/she had a buyer willing to purchase 360 DME for $75,000. Individual 2 was not advised of the identity of the buyer, and the broker handled the sale negotiations. Individual 2 recalled that the terms of the sale required that Individual 2 relinquish the business's bank account at Financial Institution 1 to the buyer. The sale also involved the buyer's leasing the building where 360 DME was situated from Individual 2.  During the closing, Individual 2 learned that the buyer was an individual identified as **KASHPUR** of Kashpur Management. As the owner of the property, Individual 2 rarely visited the building, but was informed a few months later from an employee of 360 DME that "they" wanted to move 360 DME to another location and were going to have to lay off the employee. In or around October 2022, 360 DME vacated the leased site. Prior to 360 DME's vacating the site, Individual 2 received telephone calls from beneficiaries asking why 360 DME was billing Medicare for items that they did not want or need, and had not received. Individual 2 informed the beneficiaries that he/she no longer owned 360 DME. Individual 2 also noticed that, after the sale, he/she began receiving significantly more mail to his/her post office box than he/she had previously received, such that the post office had to store the mail in boxes. Individual 2 advised the employee of the situation and asked that the new owners arrange to have the mail delivered to another location. The mail was redirected to the physical address of 360 DME. Individual 2 allowed investigators to photograph the large quantity of mail that remained after 360 DME vacated the leased property.

14

53.     Also on November 16, 2022, investigators interviewed the broker for the sale of 360 DME, who indicated that he/she received an inquiry from **KASHPUR** about 360 DME through the brokerage website. The broker did not meet **KASHPUR** in person, but communicated with him about the sale over email, telephone, and text message. The broker believed that **KASHPUR** drafted the sale contracts. The broker explained that it should be the buyer's understanding when a business is purchased that they should file paperwork reflecting the change of ownership.

54.     On November 29, 2022, investigators interviewed an employee of 360 DME who was hired in July 2022 after responding to a post for a DME consultant on Indeed.com. The posting indicated that the job duties would be to administer and manage the DME store, assist clients with getting medical equipment, and supporting future employees. The employee spoke with a female who claimed to be the hiring manager over the telephone. The hiring manager explained that Kashpur Management was in the process of purchasing a DME store and, once it was operational, they needed someone to retrieve the mail and to fax and scan documents. The employee was paid $3,000 to $5,000 per month by Zelle to go into 360 DME three to four days per week and scan and fax all mail correspondence to the hiring manager. The employee was also instructed to deposit any checks received by 360 DME into an account at Financial Institution 1. The employee received telephone complaints at 360 DME about billing errors and continuous glucose monitors, but he/she would direct complaints to the hiring manager. In September 2022, a police officer informed the employee about a complaint received from a patient who was charged for a continuous glucose monitor billed in error. The day after the officer's visit, the employee was told that 360 DME was moving locations and not taking any of the equipment. The employee became suspicious and

stopped working for 360 DME, refusing to scan the mail and deposit the checks. The employee was thereafter told that his/her employment would be terminated.

55.     On December 16, 2022, investigators emailed Individual 3, the other former owner of 360 DME. Individual 3 spoke with **KASHPUR** over the telephone regarding the sale and got the feeling that **KASHPUR** wanted to keep his name off "stuff." According to Individual 3, **KASHPUR** drafted the sale contract. Individual 3 stated that the closing was done online, and he/she did not meet **KASHPUR**. Individual 3 confirmed that prior to the sale, 360 DME had no complaints, but that after the sale, there were complaints on social media and search engines for equipment not being delivered.

   e.  *Medicare Billing Records*

56.     An analysis of 360 DME's Medicare billing records indicates that 360 DME billed Medicare for supplying items from July 20, 2022, through November 8, 2022, for approximately 76 beneficiaries who had been deceased for 30 or more days.

57.     Analysis of 360 DME's Medicare billing records for the same time period also indicates that approximately 97% of beneficiaries had no prior relationship with the referring provider.

   f.  *Beneficiary and Provider Interviews*

58.     Investigators interviewed seven beneficiaries who allegedly received continuous glucose monitors from 360 DME.  All beneficiaries denied receiving continuous glucose monitors from 360 DME and had never seen the referring provider or heard of 360 DME.

59.     Investigators interviewed four providers who signed orders for continuous glucose monitors filled by 360 DME. The providers were both recruited by a telemedicine company through an advertisement on Indeed.com that sought physicians to review medical orders for

16

diabetic patients to determine if they met the criteria for continuous glucose monitors. The physicians were told that the beneficiaries were established diabetic patients who had been vetted by a mid-level provider. The physicians received batches of orders via email to review and sign if the beneficiary met the criteria for a continuous glucose monitor. The physicians became aware that the orders were being filled by 360 DME when the beneficiaries began calling their offices to complain about the fraudulent billing.

g.  *Financial Records*

60.     A review of 360 DME's financial records revealed activity inconsistent with the running of a large-scale continuous glucose monitor business. For example, a detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a continuous glucose monitor business, such as a large volume of continuous glucose monitor purchases, shipping or packaging fees, and/or storage fees. Furthermore, most of the funds that flowed into the 360 DME ACCOUNT were then quickly withdrawn, with some funds being sent to foreign bank accounts, including to accounts in China.

61.     Between on or about July 5, 2022, and continuing through on or about October 19, 2022, after **KASHPUR** purchased 360 DME, 360 DME billed Medicare approximately $19,668,542 for continuous glucose monitors and continuous glucose monitor supplies, and Medicare paid approximately $9,722,510, with approximately $7,002,773.56 being direct deposited by CGS into the 360 DME ACCOUNT. For some claims, a Medigap Supplemental Insurer paid out additional funds to 360 DME for continuous glucose monitors and related supplies.

**KASHPUR's Involvement in the Fraudulent Scheme**

*a. Banking*

62.     **KASHPUR** was the only authorized signer on the Kashpur Management Account and provided the following documentation as proof of identification when opening the account:





63.     **KASHPUR** was the only authorized signer on the WEST LAKE ACCOUNT and the 360 DME ACCOUNT.

64.     On or about July 11, 2022, **KASHPUR** entered a Palm Beach County branch of Financial Institution 1 to add himself as a signatory for the 360 DME ACCOUNT. **KASHPUR** provided his Florida driver's license as proof of identification.  **KASHPUR**'s Florida driver's license photograph is depicted below:



65.     I reviewed the signature cards for the WEST LAKE ACCOUNT, the 360 DME ACCOUNT, and the Kashpur Management Account and compared them with the sale documents for WEST LAKE and 360 DME, and in my training and experience, the signatures all looked to be signed by the same individual. On or about March 14, 2024, **KASHPUR** enlisted in the Florida National Guard, and, during the enlistment process, signed multiple documents. In my training and experience, the documents known to be signed by **KASHPUR** related to his enlistment in the Florida National Guard match the signatures used to open the financial accounts and purchase the businesses of WEST LAKE and 360 DME.

66.     A review of the financial records for the WEST LAKE ACCOUNT and the 360 DME ACCOUNT show multiple direct deposit payments from Medicare, through Medicare Administrative Contractor CGS Administrators, LLC, for paid Medicare claims, as well as records of multiple check deposits from private health insurers and TRICARE that represent payments from Medigap Supplemental Insurers.

67.     A review of the financial records also showed that significant sums of money were transferred from the WEST LAKE ACCOUNT and the 360 DME ACCOUNT to bank accounts held in Hong Kong by foreign entities. Specifically, over $6,900,000 was transferred from the WEST LAKE ACCOUNT to Hong Kong bank accounts, and over $7,000,000 was transferred from the 360 DME ACCOUNT to Hong Kong bank accounts.

68.     A review of the financial records for the Kashpur Management Account shows that it received funds from the WEST LAKE ACCOUNT and the 360 DME ACCOUNT. Specifically, the Kashpur Management Account received $85,000 from the WEST LAKE ACCOUNT. The Kashpur Management Account also received $5,000 from the 360 DME ACCOUNT, as well as an additional $65,000 from other financial accounts held by 360 DME. **KASHPUR** paid himself approximately $72,720 from the Kashpur Management Account by transferring those funds to another account that he held.

   b.  *Health Care Claims Submission*

69.     Evidence shows that **KASHPUR** knew of and caused the submission of claims to Medicare on behalf of the DME companies he purchased.  Investigators obtained Internet Protocol ("IP") address information from these billing companies; however, the billing software was primarily accessed through a Virtual Private Network ("VPN"), which masks the true location of the user.

   1.  *WEST LAKE Billing.*

70.     For example, on May 26, 2022, **KASHPUR** signed a one-year service contract agreement with Billing Company 1 on behalf of WEST LAKE that listed him as the owner of WEST LAKE. Billing Company 1 provided software that DME companies such as WEST LAKE utilized to submit electronic claims to Medicare and other health care benefit programs.

71.     On or about June 6, 2022, an individual purporting to be **KASHPUR** and using the handle @artem joined a chat hosted by Slack, a cloud-based team communication platform, with representatives of Billing Company 1. From June 6, 2022 through August 23, 2022, this individual, who will be referred to as **KASHPUR**, and the representatives of Billing Company 1 discussed

WEST LAKE's billing of claims to Medicare in intricate detail. Some of the more salient points of the chats are excerpted below.

72.    On June 7, 2022, **KASHPUR** messaged Billing Company 1 stating, "I would like to follow up and see if there's an update on the clearinghouse site." When Billing Company 1 responded on June 8, 2022, that they hoped to get an answer to **KASHPUR** later that day, **KASHPUR** messaged, "We have a lot of patients ready."

73.    Later on June 8, 2022, **KASHPUR** messaged the representatives of Billing Company 1, stating, "How does billing the Insulin Pump work? Also I'd like to ask how to set up refills for CGM [continuous glucose monitors]."

74.    On June 10, 2022, **KASHPUR** messaged the representatives of Billing Company 1, stating, "We really need to start submitting by the beginning of next week, because we have patients asking when they will get there [sic] supplies. Is there any way to speed the process up?"

75.    On June 13, 2022, the billing company advised **KASHPUR** that they heard back from the clearinghouse that WEST LAKE's account was being set up. **KASHPUR** responded, "How we add Texas Medicare to the insurance list?" Later that day, **KASHPUR** asked, "Where should we track remittance once billing begins?"

76.    On June 14, 2022, **KASHPUR** questioned, "Is there any clarity on when we will be ready to submit claims?" Billing Company 1 representatives responded that the clearinghouse account had been set up. **KASHPUR** responded on June 15, 2022, "What are the next steps? Does this mean we can start processing?"

77.    On June 16, 2022, **KASHPUR** again asked about timing, stating "Will we be able to submit claims to Medicare tomorrow?"

78.     On June 20, 2022, a representative of Billing Company 1 sent **KASHPUR** a message about eligibility for Medicare coverage of continuous glucose monitors, including that the beneficiary has diabetes mellitus, and that the treating practitioner has an in-person visit with the beneficiary within six months prior to ordering the continuous glucose monitor to evaluate the beneficiary's diabetes control. **KASHPUR** responded, "Hello. Got it.  And how do we set up refills for CGM?"

79.     On June 21, 2022, **KASHPUR** sent Billing Company 1 representatives a message stating, "We are getting the claims ready to be transmitted. We see a few that say reject. Where is the reason why?" A Billing Company 1 representative explained that **KASHPUR** could go to billing history to see the rejection reason. **KASHPUR** then asked, "Are you aware of the reason the claim is not processable?" Then, **KASHPUR** asked, "Also is there a quick way to check eligibility without creating a new patient?" Billing Company 1 then identified various errors made in the claims submission process.

80.     On June 22, 2022, **KASHPUR** questioned Billing Company 1 as to why certain claims had been denied, stating "Every single claim with active coverage came back as rejected with the same message." Billing Company 1 representatives explained that the claims were getting rejected by the payer, stating, "[i]f you have complete documents and it met the coverage guidelines then you must use CG MOD," and instructed **KASHPUR** to use modifier KX if the beneficiary is insulin treated or modifier KS if the beneficiary is non-insulin treated.

81.     On June 23, 2022, representatives of Billing Company 1 messaged **KASHPUR**, "Hi @artem, there are 76 claims assigned to user RE-CHECK. Are you assigning claims to this user for your internal team to work on?" **KASHPUR** responded, "Hello. Yes, correct. Do not

22

process please." **KASHPUR** later asked, "How do we know if these claims actually went through?"

82.    On June 28, 2022, **KASHPUR** messaged Billing Company 1, stating, "We got 2 denials, please let me know what the reason is." A representative of Billing Company 1 messaged **KASHPUR** stating, "These claims were denied for the denial reason 'Duplicate claim/service'. Let us contact the payer then I will provide you more details." The representative followed up stating, "Claim #7 was denied as a Duplicate claim because we have already billed same HCPCS [Healthcare Common Procedure Coding System] in Claim# 406. They have also denied Claim# 406 because there is an HMO [health maintenance organization] on file. CHA HMO, INC. is the primary payer. Claim# 104 was denied because we have submitted two claims for the same DOS [date of service] . . . @artem Please guide the Intake team to check eligibility carefully. If there is HMO on file or the patient was in HOSPICE or SNF [skilled nursing facility] then we can't bill Medicare . . . @artem Also, once we create a claim for the HCPCS K0554 and K0553 we can bill the payer for the same HCPCS or supplies only after 30 days. So, please guide the team to create new claims for the same patient after 30 days only."

83.    On June 29, 2022, **KASHPUR** again requested information regarding "the new rejections that showed up today." Billing Company 1 representatives advised **KASHPUR** of the various reasons for the claim denials, to include: Medicare Part B being inactive on the date of service; and the beneficiary name and Medicare number did not match with their records.

84.    On July 26, 2022, **KASHPUR** asked Billing Company 1 representatives how to enroll in another Medicare region and was told to visit the Common Electronic Data Interchange enrollment website.

85.     On July 27, 2022, **KASHPUR** asked Billing Company 1 representatives, "If there is a mistake with patient address will the claim get denied?" A Billing Company 1 representative responded, "If you are billing claim to a wrong Medicare region then it will be denied."

86.     On August 9, 2022, **KASHPUR** asked Billing Company 1 representatives about recent denials and rejected claims, and a representative of Billing Company 1 stated, "Hi @artem, Denials are related to eligibility, claim submitted to wrong jurisdiction, and some other supplier has already billed that item."  The representative of Billing Company 1 also advised **KASHPUR** that three of the denied claims had been billed for deceased patients.

*2.  360 DME Billing.*

87.     On or about July 15, 2022, **KASHPUR** executed a Network Service Agreement with Billing Company 2 on behalf of 360 DME as the owner of 360 DME, whereby Billing Company 2 would perform delivery, processing, and management of electronic health insurance claims for 360 DME.

88.     Investigators obtained the Activity History, which documents telephone calls, emails, and other communications between Billing Company 2 and representatives of 360 DME, including emails with an individual utilizing the email address artem@kashpurgroup.com and purporting to be **KASHPUR** and telephone calls with an individual who identified himself as **KASHPUR**.

89.     On or about July 20, 2022, an individual who identified himself as **KASHPUR** had a telephone call with a representative of Billing Company 2 to be trained on the submission of claims. That same date, **KASHPUR** emailed Billing Company 2 and asked how to add referring doctors.

90.     On or about July 21, 2022, an individual who identified himself **KASHPUR** spoke via telephone with a representative of Billing Company 2 and stated that he thinks they know how to bill and do not need training. The representative walked **KASHPUR** through reports, adding patients to a batch, and walked through the claim, advising him to send multiple claims in a batch. **KASHPUR** advised that he was "good."

91.     On or about July 22, 2022, **KASHPUR** emailed a representative of Billing Company 2, asking, "[w]hy does it say rejected?" In another email that same date, **KASHPUR** stated, "[a]lso please confirm if the batch 7.21 was properly billed." **KASHPUR** emailed later that day to confirm that "the rest of the claims went out to Medicare." **KASHPUR** also inquired about what "Type 276" for 50 claims meant and requested that another training be set.

92.     On or about July 25, 2022, **KASHPUR** emailed a representative of Billing Company 2 asking "[d]oes this mean the whole Batch is rejected?" Additional training of **KASHPUR** was conducted that same date.

93.     On or about August 5, 2022, **KASHPUR** emailed a representative of Billing Company 2 asking, "why do certain claims stay in accepted after the day they should be paid?"

94.     On or about August 8, 2022, **KASHPUR** emailed a representative of Billing Company 2 stating, "We have a question regarding the claims that are still in 'Accepted' status that should have already received an EOB [explanation of benefits]. We are concerned we made a mistake."

95.     On or about August 9, 2022, **KASHPUR** emailed a representative of Billing Company 2, asking, "How can we reverse claims? Please provide an instruction." When the representative stated he/she was not sure what **KASHPUR** meant, he clarified, "I mean if a claim was billed in error and we need to cancel it and make sure it's refunded."

25

96.     On or about August 26, 2022, **KASHPUR** emailed a representative of Billing Company 2, stating, "Our doctor sent us a couple of new patients from a different state (Ohio).  As we understand this is Jurisdiction B. We have normally been using Payer ID 18003 for Jurisdiction C. The only Payer ID we found for Jurisdiction B is 17013. But under the 'Enroll' section it says NO.  The question is, does it mean we can't be billing Jurisdiction B at all or do we just need a different code?" **KASHPUR** was advised to call Medicare and verify if they will forward the claim or if they needed to enroll for a different jurisdiction, and **KASHPUR** responded, "But how do we get permission to bill another Jurisdiction?"

97.     On August 31, 2022, **KASHPUR** emailed a representative of Billing Company 2, stating, "How do we stop the auto cross over of billing the patients secondary insurance?" The representative advised, "Medicare does that, so you would need to ask Medicare."

98.     **KASHPUR** logged into Billing Company 2's software with the username assigned to him under his 360 DME account on July 19-31, August 1-31, September 1-30, October 1-20, October 24-31, November 1, November 8, and November 9, 2022.

## CONCLUSION

99.     Wherefore, based upon the above information, I believe probable cause exists that, from at least in or around May 2022, through at least in or around November 2022, in Palm Beach County, in the Southern District of Florida, and elsewhere, **KASHPUR** did conspire to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

## REQUEST FOR SEALING

100.    I further request that this Court order that all papers in support of this complaint and arrest warrant, including the affidavit, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to the targets

of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Nicholas Tarquin  Digitally signed by Nicholas Tarquin
Date: 2025.05.08 11:03:57 -05'00'

Nicholas Tarquin
Special Agent
Department of Health and Human Services,
Office of Inspector General

Attested to in accordance with the requirements
of Fed. R. Crim. P. 4(d) and 4.1 by FaceTime on
May 8th, 2025.

THE HONORABLE WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

27

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

**Defendant's Name**:   ARTEM KASHPUR

**Case No**: 25-mj-8240-WM

Count #: 1

18 U.S.C. § 1349

* **Max. Term of Imprisonment:** 20 years
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** 3 years
* **Max. Fine:** $250,000 or twice the value of the gross gain or loss, whichever greater

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**